**The below described is SIGNED.**

**Dated: November 23, 2014**

*William J. Thurman*



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**ALYSSE TERRY MONSON,**<br><br>Debtor. | Bankruptcy Number: 12-31811<br><br>Chapter 13<br><br>Judge William T. Thurman |
| In re:<br><br>**STANLEY A. TALBOT** and<br>**PRESHA A. TALBOT,**<br><br>Debtors. | Bankruptcy Number: 11-38095<br><br>Chapter 7<br><br>Judge William T. Thurman |

## MEMORANDUM DECISION

The matters before the Court are the motions filed by the United States Trustee to assess fines against Virgle F. Odekirk and to cause forfeiture of his fees for his alleged violations of 11 U.S.C. § 110,[1] the section of the Bankruptcy Code governing bankruptcy petition preparers. The Court

---

[1] All subsequent statutory references are to title 11 of the United States Code unless otherwise indicated.

1

conducted an evidentiary hearing on the motions on September 26, 2014. John T. Morgan appeared

on behalf of the United States Trustee, and Mr. Odekirk appeared *pro se*. The Court received exhibits

into evidence, listened to the testimony of witnesses, and heard the arguments of the parties, then

took the matters under submission. After carefully weighing the evidence and credibility of the

witnesses, considering the parties' briefs and arguments, and conducting its own independent

research of applicable law, the Court now issues the following Memorandum Decision, which

constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure

52, made applicable in these contested matters by Federal Rules of Bankruptcy Procedure 9014 and

7052.

## I.      JURISDICTION AND VENUE

The Court's jurisdiction over these matters is properly invoked under 28 U.S.C. § 1334(b)

and § 157(a) and (b). These matters constitute core proceedings under 28 U.S.C. § 157(b)(2)(A).

Venue is appropriately laid in this District under 28 U.S.C. § 1409, and notice has been properly

given in all respects.

## II.     FINDINGS OF FACT

Virgle Odekirk is not an attorney. After working in the construction business, he switched

careers and became a bankruptcy petition preparer approximately five years ago. He first worked for

six months under the tutelage of Gene Till, a bankruptcy petition preparer in Provo, Utah, then

moved to St. George, Utah. Since that time, Mr. Odekirk has been operating a bankruptcy petition

preparer business there with his wife Ruth called The Bankruptcy Guy, which is a *dba*. Mr. Odekirk

attracts clients through advertisements on his car, advertisements placed in the Pioneer Shopper (a

regional printed advertising periodical), and referrals.

2

When a person contacts Mr. Odekirk about filing for bankruptcy, he has that person fill out an intake form that was developed from the form used by Till's bankruptcy petition preparer business. The intake form is a 12-page questionnaire that requests such information as prior bankruptcy filings, an itemized list of real and personal property, the existence of any co-debtors on a loan, income and expenses, and a page entitled "all debts that you want to file on not listed on your credit report." On the third page, next to the heading for personal property, the intake form instructs clients to "put the **YARD SALE VALUE** for each of the items you have." The intake form also requests that clients obtain a current credit report.

Once the client returns the intake form, either Ruth or Virgle uses it, along with the credit report and other information a client may provide, to fill out the documents that will be filed with the bankruptcy court.[2] It is Mr. Odekirk's practice to meet with every client at least twice. At the first meeting, the client and Mr. Odekirk sign a contract, and the client may fill out the intake form at that time.[3] At the second meeting, which occurs after Mr. Odekirk has prepared the bankruptcy documents, the client signs the documents before they are filed. On occasion, additional meetings are necessary.

The contract Mr. Odekirk executes with his clients provides that he charges $299 for his services. It also contains a notice that informs his clients that he is not an attorney and is not authorized to practice law or give legal advice. The notice goes on to state that Mr. Odekirk is "forbidden to offer [his clients] any legal advice about any of the following," at which point the notice parrots the enumerated examples of legal advice in § 110(e)(2)(B)(i)-(vii).

---

[2] Ruth performs this function about three-quarters of the time and Virgle the other quarter.

[3] In some cases, Mr. Odekirk e-mails the intake form to the client.

*A. The Talbots*

Stanley and Presha Talbot called Mr. Odekirk to inquire about filing for bankruptcy and subsequently met with him three times. The first meeting occurred at the Talbots' home in November 2011, where Mr. Odekirk informed them about what services he provides, the manner in which he provides them, and what documentation the Talbots would need to deliver to him. The Talbots next met with Mr. Odekirk at a Subway restaurant in Cedar City, Utah, shortly before Christmas, at which time he had primarily all of the bankruptcy documentation prepared. The third meeting took place at Mr. Odekirk's office, where he informed the Talbots that they had the option to pay the filing fee in installments. The Talbots did not know about that option before meeting with Mr. Odekirk.

After the Talbots had filled out the intake form, they discussed it with Mr. Odekirk. He asked them whether the values they had listed were what they thought they could get for their property at a yard sale. Based on that conversation, the Talbots changed some of the values on the intake form. Mr. Odekirk then prepared their schedules. Schedule B lists two vehicles—a 1999 Chevrolet Suburban valued at $2,465 and a 1995 Isuzu Rodeo valued at $1,510. Mr. Odekirk testified that he obtained those values from Kelley Blue Book.[4] In completing the Talbots' Schedule C, Mr. Odekirk presented a list of Utah exemption statutes to the Talbots. Although Mrs. Talbot did not know what the statutes meant, she filled out the column of Schedule C entitled "Specify Law Providing Each Exemption" and initialed next to each entry.[5] He also advised the Talbots to exempt a rental deposit

---

[4] It appears that Mr. Odekirk uses Kelley Blue Book to value most, if not all, of his clients' vehicles. Page 5 of the intake form requests that clients provide the mileage for their vehicles. Mr. Odekirk testified that the mileage figure was necessary, despite not being requested by the bankruptcy schedules, because "Kelley Blue Book asks for mileage."

[5] Mrs. Talbot did not fill out each entry entirely. All but one exemption on Schedule C begins with a typed "7" after which she handwrote the remainder of each chosen exemption statute.

because they paid it out of their wages. On the Talbots' Means-Test Calculation (also referred to as Official Form 22A), the box captioned "The presumption does not arise" is checked, although neither Mr. nor Mrs. Talbot knew what that meant.

The Talbots discussed other bankruptcy issues with Mr. Odekirk, including which chapter would be best for them. After describing their financial circumstances—which included medical debt, delinquent bills, and insufficient income to meet their debt obligations—to Mr. Odekirk, he advised them that Chapter 7 would be best for them. He counseled the Talbots to take the online credit counseling course and told them that due to his preparation of the requisite documents, they did not need an attorney. He also told the Talbots that it would be best if they did not have any money in their bank account; otherwise, it could be taken away in the bankruptcy.[6] Mr. Odekirk counseled them to open a checking account at a different bank where they could deposit Mr. Talbot's paychecks. The Talbots did as they were advised and opened the second account post-petition. On multiple occasions, Mr. Odekirk would tell the Talbots that he is not an attorney and could not give them legal advice while at the same time waving his fingers in the air to make quotation marks around the words "legal advice" as he said them.

At the second or third meeting with Mr. Odekirk, the Talbots told him that they would be receiving a tax refund and asked him whether they could spend it. Prefacing his reply with the disclaimer that he could not give legal advice, Mr. Odekirk informed the Talbots that if they spent it on necessities and kept their receipts, the trustee would not object to their use of the refund. Mr. Odekirk concluded the conversation by cautioning the Talbots that if they said that he had given them legal advice, he would deny it.

---

[6] Mr. Odekirk testified that it was his past practice to claim money in debtors' bank accounts as exempt. After admonishments from trustees, he stopped that practice.

The Talbots received their tax refund post-petition and, in accordance with the information

Mr. Odekirk provided, spent it on rent, bills, and food.[7] They dutifully kept their receipts as they had

been instructed. They filed their present Chapter 7 case on December 29, 2011, and at the § 341

meeting, the Talbots informed the Chapter 7 trustee that they had spent the refund but had receipts

for all expenditures. Despite doing precisely as they had been told, they learned that the trustee did

want the refund. As a consequence, the Talbots filed another case, this time a Chapter 13 case, to

repay the debt to the Chapter 7 estate pursuant to a plan. They incurred a cost of $4,681 to file that

Chapter 13 case—$281 for the filing fee and $4,400 in attorney's fees.

*B. Alysse Monson*

Alysse Monson met with Mr. Odekirk in June 2012 after seeing one of his advertisements

in the Pioneer Shopper. At that meeting, Ms. Monson inquired of Mr. Odekirk whether filing a

Chapter 7 bankruptcy would be best for her since she had some assets and she did not understand

bankruptcy. Among her assets was a house located in La Verkin, Utah that her husband had given

to her approximately a decade ago. She informed Mr. Odekirk that she was renting that property out

and using the income to support her and her three children and that she did not want to file for

bankruptcy if that would cause her to lose the property. Prefacing his reply with the disclaimer that

he is not an attorney, Mr. Odekirk advised Ms. Monson that the rental property would be safe

without offering an explanation for that conclusion.

Ms. Monson's assets also included a "beat-up" 2007 Honda Pilot, which her mother had

given to her upon her death. Ms. Monson brought the car up with Mr. Odekirk, stating that she did

not know how much it was worth. Mr. Odekirk valued the Pilot at $2,000 due to the damage it had

---

[7] The Talbots also paid their tax preparer's fee using the refund.

sustained, and this is the value of the Pilot listed on Ms. Monson's Schedule B. When Ms. Monson

questioned him about that figure, he told her not to worry about it. Ms. Monson also inquired

whether she could lose the vehicle if she filed for bankruptcy, but Mr. Odekirk assured her that she

would not have it taken from her.

Like the Talbots, Ms. Monson completed Mr. Odekirk's intake form.[8] In completing her

Schedule C, Mr. Odekirk advised Ms. Monson that she would have to transfer certain exemption

statutes from an apparently completed Schedule C onto a blank Schedule C. When she responded

that her poor handwriting would prevent her from doing that, Mr. Odekirk told her to take the

completed Schedule C and initial each entry. Ms. Monson denies that the applicable exemption

statutes on her Schedule C are written in her hand, but she acknowledges that she wrote the initials

"AM" for Alysse Monson after each entry. Mr. Odekirk also had her take the online credit

counseling class.

Ms. Monson filed a petition under Chapter 7 on September 14, 2012. At the § 341 meeting

the trustee inquired into the rental property and the Pilot, informed Ms. Monson that he wanted to

liquidate them for the benefit of creditors, and requested appraisals for both. In response, Ms.

Monson considered hiring an attorney to address the issues presented by the trustee. She called Mr.

Odekirk and told him that she was losing everything she wanted to keep and that she would need to

hire an attorney. Mr. Odekirk replied that she did not need to hire an attorney and he reassured her

that she would not lose her assets in bankruptcy. Ultimately, Ms. Monson did hire an attorney, who

---

[8] Mr. Odekirk testified that he destroyed Ms. Monson's and the Talbots' intake forms some time
after they filed for bankruptcy.

made an unsuccessful attempt to have her case dismissed.[9] She hired a second attorney, who successfully had her case converted to one under Chapter 13.[10] She has incurred $4,681 in fees—$281 for the conversion fee and $4,400 in attorney's fees—as a result of the attorneys she hired.

After fighting for two years to save the rental property that she had used to support her family, Ms. Monson recently sold it. According to Ms. Monson, the property sold for approximately $99,000. Roughly $65,000 of the proceeds went to pay off the mortgage, $17,000 went to the Chapter 13 trustee to pay off her Chapter 13 plan, a portion went to pay off attorney's fees, and she received $5,000.[11]

## III.    DISCUSSION

Some of those who contemplate filing for bankruptcy are caught between a rock and a hard place. Unable to afford an attorney, yet lacking the knowledge to navigate the currents and eddies of a bankruptcy case alone, they turn hopefully to what appears to be a workable compromise. Bankruptcy petition preparers typically cost much less than an attorney, and although not attorneys,

---

[9] *See* Docket No. 23, Debtor's Motion to Dismiss Chapter 7, *and* Docket No. 41, Order Denying Debtor's Motion to Dismiss Chapter 7. These documents were not among the exhibits introduced into evidence, but the Court takes judicial notice of them. "[A] court may . . . take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records." *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).

[10] *See* Docket No. 57, Order Granting Motion to Vacate Discharge Granted Pursuant to 11 U.S.C. § 727 and Motion to Convert Chapter 7 Case to Case Under Chapter 13. This document also was not among the exhibits introduced into evidence.

[11] The $5,000 figure represents Ms. Monson's entitlement under Utah law to a homestead exemption in real property that was not her primary personal residence on the petition date. *See* Utah Code Ann. § 78B-5-503(2)(a)(i) (2014). Ms. Monson claimed the $5,000 exemption in the rental property in the Schedule C she filed after conversion.

8

they seem to offer the helping hand that debtors so dearly want.[12] But the venerable adage that if something is too good to be true, it probably is—so often a steady rule of thumb in other contexts—rings true here.

Bankruptcy petition preparers are limited to providing "typing, data entry and photocopying services to persons who have already decided to file bankruptcy."[13] Although a debtor may expect them to offer some measure of guidance on bankruptcy rights and procedures, they "are not some sort of legal/paralegal hybrid authorized under the Bankruptcy Code."[14] In fact, the Code specifically forbids bankruptcy petition preparers from giving legal advice.[15] The proscription against giving legal advice is broad,[16] and it is no defense that the advice is correct.

---

[12] At least one court has suggested that the rise in the number of bankruptcy petition preparers has its roots in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which created new "Congressionally instituted hurdles," which in turn led to higher attorney's fees in order to surmount those hurdles. As a consequence, bankruptcy petition preparers grew to offer a "less expensive alternative." *Wieland v. Assaf (In re Briones-Coroy)*, 481 B.R. 685, 691 (Bankr. D. Colo. 2012).

[13] *Id*. at 690; *see also Jonak v. McDermott*, 511 B.R. 586, 596 (D. Minn. 2014) ("[T]he case law makes it 'abundantly clear that providing anything more than typing services is prohibited under § 110.'"); *In re Bernales*, 345 B.R. 206, 216 (Bankr. C.D. Cal. 2006) ("The law is clear: '[T]he services of bankruptcy petition preparers are strictly limited to typing bankruptcy forms.'"); *In re Dunkle*, 272 B.R. 450, 455 (Bankr. W.D. Pa. 2002) ("A petition preparer is only authorized to type information exactly as provided by potential debtors."); *In re Gomez*, 259 B.R. 379, 385 (Bankr. D. Colo. 2001) ("Congress' clear intent was that § 110 authorize bankruptcy petition preparers to provide only scrivener services, limited to clerical services such as copying and typing."); *In re Guttierez*, 248 B.R. 287, 298 (Bankr. W.D. Tex. 2000) ("The only service that a bankruptcy petition preparer can safely offer and complete on behalf of a *pro se* debtor after the enactment of § 110 is the 'transcription' of dictated or handwritten notes prepared by the debtor prior to the debtor having sought out the petition preparer's service.").

[14] *Briones-Coroy*, 481 B.R. at 690.

[15] § 110(e)(2).

[16] *U.S. Trustee v. McIntire (In re Sanchez)*, 446 B.R. 531, 538 (Bankr. D.N.M. 2011).

But the prohibition against giving legal advice is not the only rule by which bankruptcy petition preparers must abide. Section 110 contains a multitude of imperatives and restrictions with which every bankruptcy petition preparer should become familiar. That section "was enacted as part of the Bankruptcy Reform Act of 1994" with the aim of addressing "the proliferation of non-attorney bankruptcy petition preparers who are not working with or supervised by an attorney."[17] Specifically, Congress enacted § 110 "to protect consumers from abuses by non-lawyer petition preparers,"[18] which included the perceived problems of "widespread fraud and unauthorized practice of law in the [bankruptcy petition preparer] industry."[19] With regard to the latter problem, Congress was "concerned that debtors would be at the mercy of fly-by-night 'typing mills' that would lull the unsuspecting public into thinking that they had the expertise to offer valuable legal (or at least quasi-legal) bankruptcy assistance."[20] The legislative history to the Bankruptcy Reform Act of 1994 further illuminates Congress's purpose:

> While it is permissible for a petition preparer to provide services solely limited to typing, far too many of them also attempt to provide legal advice and legal services to debtors. These preparers often lack the necessary legal training and ethics regulation to provide such services in [an] adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system.[21]

---

[17] *In re Moffett*, 263 B.R. 805, 811 (Bankr. W.D. Ky. 2001).

[18] *Consumer Seven Corp. v. U.S. Trustee (In re Fraga)*, 210 B.R. 812, 818–19 (B.A.P. 9th Cir. 1997) (citations omitted).

[19] *Ferm v. U.S. Trustee (In re Crawford)*, 194 F.3d 954, 960 (9th Cir. 1999).

[20] *Guttierez*, 248 B.R. at 295. This concern came to the fore in Ms. Monson's case. She testified that she understood that Mr. Odekirk was not an attorney but nonetheless believed that he had "great knowledge" about bankruptcy because he called himself The Bankruptcy Guy.

[21] H.R. Rep. No. 103-835, at 56 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3365.

10

Congress amended § 110 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which added § 110(e)(2).[22] That provision "codifies the case law under both state and federal law which prohibits petition preparers from offering legal advice to clients."[23]

Congress's intent is clear: bankruptcy petition preparers are forbidden from performing all but a select few tasks for potential debtors. While many bankruptcy petition preparers undoubtedly offer assistance beyond the bounds of § 110 because they genuinely want to help debtors rather than defraud them, that distinction is not relevant for purposes of § 110. The problem remains that many know only marginally more about bankruptcy than their clients, which often leads to the provision of "fragmented and incomplete legal assistance, the inadequacies of which are not readily apparent to debtors."[24] In turn, this causes a "detriment [to] both the bankruptcy system and the consuming public."[25] Section 110 attempts to remedy this problem by limiting the services a bankruptcy petition preparer can provide.

### A. Allegations Common to Both Cases

The United States Trustee has alleged that Mr. Odekirk committed 13 discrete violations of § 110 in each of Ms. Monson's and the Talbots' cases. In each of the cases, four of the alleged violations are related to Mr. Odekirk's failure to disclose his identity on certain documents filed in

---

[22] *In re Hennerman*, 351 B.R. 143, 150 (Bankr. D. Colo. 2006).

[23] *Id.*

[24] *Gomez*, 259 B.R. at 388.

[25] *Guttierez*, 248 B.R. at 297; *see also In re Amezcua*, No. BR 12-21370 JTM, 2013 WL 272809, at *1 (Bankr. D. Utah Jan. 18, 2013) ("[Bankruptcy petition preparers who] either willingly or inadvertently run afoul of § 110[] creat[e] problems for their clients (the debtors) and the courts.").

the case, while nine involve providing legal advice. Owing to the factual similarity between the cases, many of the violations alleged in one case are likewise alleged in the other. To avoid needless repetition, the Court will consolidate its conclusions of law where the allegations are the same in both cases.

At the outset, the Court must determine if Mr. Odekirk meets the definition of a bankruptcy petition preparer under the Code. Section 110(a)(1) defines a bankruptcy petition preparer as "a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation a document for filing." The Court concludes that Mr. Odekirk meets that definition. Moreover, in each case he signed the portion of the petition that provides, under penalty of perjury, that he is a bankruptcy petition preparer as defined in § 110.

Section 110(b)(1) requires that a bankruptcy petition preparer "who prepares a document for filing shall sign the document and print on the document the preparer's name and address." The term "document for filing" is defined as "a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under [title 11]."[26]

The United States Trustee alleges that Mr. Odekirk failed to print his name and address on and sign the Statement of Social Security Number and Chapter 7 Statement of Current Monthly Income and Means-Test Calculation in Ms. Monson's and the Talbots' cases. Those two documents fall squarely within the definition of a document for filing, and the Court finds that in neither case did Mr. Odekirk place his name, address, or signature on them. Mr. Odekirk does not deny that he

---

[26] § 110(a)(2).

prepared them, but instead argues that he should not be fined because those documents, unlike other bankruptcy forms, do not provide designated lines for a bankruptcy petition preparer to enter the required information. This defense is unavailing. The plain language of the statute does not except documents from the mandate of § 110 because they lack a specific place for a bankruptcy petition preparer's name, address, and signature.

Yet it is true that certain documents do not have a designated place for the information demanded by § 110. In those instances, a bankruptcy petition preparer can meet the disclosure requirements by filling out Form 19. That form provides spaces for a bankruptcy petition preparer's name, address, signature, and Social Security number. It also provides spaces to list multiple documents that were prepared for filing. "Thus, when multiple documents are filed at one time, the preparer can comply with the disclosure and identification requirements by signing and identifying him or herself on just one Form 19 and listing there all the prepared documents."[27] In each case, Mr. Odekirk filled out Form 19, completing the sections that asked for his name, address, signature, and Social Security number. In the space that asks for the documents he prepared for filing, Mr. Odekirk wrote "See Attached List," but in neither case did he attach a list of the documents he prepared. Mr. Odekirk could have met his § 110(b)(1) disclosure requirement by listing on Form 19 the Statement of Social Security Number and Chapter 7 Statement of Current Monthly Income and Means-Test Calculation. Because he failed to do so, the Court concludes that Mr. Odekirk committed two violations of § 110(b)(1) in Ms. Monson's case and two in the Talbots' case.

Section 110(c)(1) imposes a disclosure requirement similar to that in § 110(b)(1), prescribing that a bankruptcy petition preparer "who prepares a document for filing shall place on the document,

---

[27] *U.S. Trustee v. Burton (In re Rosario)*, 493 B.R. 292, 346 (Bankr. D. Mass. 2013).

13

after the preparer's signature, an identifying number that identifies individuals who prepared the document." Unless the exception of § 110(c)(2)(B) applies, the required number is "the Social Security account number of each individual who prepared the document or assisted in its preparation."[28] Mr. Odekirk offers the same excuse for his failure to place his Social Security number on the two documents at issue—i.e., there is no designated line for him to write the information—but the plain statutory language recognizes no such excuse. In addition, although Form 19 allows a bankruptcy petition preparer to meet the disclosure requirements of § 110(c)(1) as well as those of § 110(b)(1), because Mr. Odekirk failed to list the documents at issue on Form 19, he has not met his § 110(c)(1) disclosure requirement with regard to those documents. Therefore, Mr. Odekirk violated § 110(c)(1) twice when he failed to place his Social Security number on Ms. Monson's Statement of Social Security Number and Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, and he violated § 110(c)(1) twice more when he failed to do the same in the Talbots' case.

The United States Trustee has also alleged that Mr. Odekirk violated § 110(e)(2) by providing the following legal advice in both cases: (1) advising the debtors on the propriety and advisability of filing a Chapter 7 bankruptcy; (2) advising the debtors on selecting exemptions; (3) advising the debtors on the requirement to obtain a credit counseling certificate; (4) advising the debtors on the ability to pay the filing fee in installments or obtain a waiver of the filing fee altogether; (5) advising the debtors on the scope and effect of a discharge; (6) advising the debtors on how to characterize the nature of their debts; (7) advising the debtors on the valuation of their property; and (8) completing the means test.

---

[28] § 110(c)(2)(A).

Section 110(e)(2) states that "[a] bankruptcy petition preparer may not offer a potential bankruptcy debtor any legal advice, including any legal advice described in subparagraph (B)."[29] In turn, subparagraph (B) defines legal advice to include providing the debtor advice on:

> (i) whether—
>     (I) to file a petition under this title; or
>     (II) commencing a case under chapter 7, 11, 12, or 13 is appropriate;
> (ii) whether the debtor's debts will be discharged in a case under this title;
> (iii) whether the debtor will be able to retain the debtor's home, car, or other property after commencing a case under this title;
> (iv) concerning—
>     (I) the tax consequences of a case brought under this title; or
>     (II) the dischargeability of tax claims;
> (v) whether the debtor may or should promise to repay debts to a creditor or enter into a reaffirmation agreement with a creditor to reaffirm a debt;
> (vi) concerning how to characterize the nature of the debtor's interests in property or the debtor's debts, or
> (vii) concerning bankruptcy procedures and rights.

The last clause—concerning bankruptcy procedures and rights—is a catchall provision with an extraordinarily wide reach.[30] "Virtually any exercise of discretion about what to include or not include in the bankruptcy documents, will touch upon a bankruptcy 'procedure' or 'right.'"[31] Despite the breadth of activities covered by § 110(e)(2), the list of what constitutes legal advice is not exhaustive.[32] Instead, it is "merely illustrative of the types of conduct that, if offered by a bankruptcy petition preparer, constitutes impermissible legal advice."[33]

---

[29] § 110(e)(2)(A).

[30] *See Hennerman*, 351 B.R. at 151–52.

[31] *Id*. at 152.

[32] *See* § 102(3). That subsection provides that the words "'includes' and 'including' are not limiting."

[33] *Sanchez*, 446 B.R. at 538 (footnote omitted).

15

The Court concludes that Mr. Odekirk violated § 110(e)(2) in both cases by advising Ms. Monson and the Talbots to file under Chapter 7. Such counseling clearly falls within the definition of legal advice under § 110(e)(2)(B)(i)(II).

Mr. Odekirk also violated § 110(e)(2) in both cases by advising the Talbots and Ms. Monson on which exemptions to select. In the Talbots' case, Mr. Odekirk provided a list of Utah exemption statutes, which Mrs. Talbot used to complete Schedule C. In Ms. Monson's case, Mr. Odekirk presented her with a completed Schedule C, which he had her initial after each claimed exemption. Mr. Odekirk is plainly aware that telling his clients which exemptions to select would constitute legal advice—he said as much on the stand during the evidentiary hearing. He appears to be under the impression, however, that he can avoid wrongdoing as long as the client writes down the exemptions on Schedule C from the list he has provided. This impression is incorrect for two reasons.

First, other courts have specifically rejected the suggestion that bankruptcy petition preparers are permitted to provide a list of exemption statutes to their clients and allow them to choose which exemptions apply.[34] Second, even if Mr. Odekirk did not choose the specific exemptions, he did choose which state's exemptions apply. Mr. Odekirk testified that it is his practice to hand his clients a schedule of Utah exemptions that he found on the Internet. This document is entitled "Schedule C Utah Exemption," which was admitted as Exhibit H.[35] He then tells his clients, and he told the

---

[34] *See Moffett*, 263 B.R. at 814; *McDow v. Skinner (In re Jay)*, 446 B.R. 227, 250–51 (Bankr. E.D. Va. 2010); *see also Briones-Coroy*, 481 B.R. at 737 ("[A] bankruptcy petition preparer is prohibited from many acts, including, but not necessarily limited to: . . . . (3) Providing debtors with a comprehensive list of available exemptions from which to choose.").

[35] The Schedule C Utah Exemption is a simple, two-page document that lists various items of property along the left-hand side of the page and matches those items with the relevant statutory

Talbots and Ms. Monson, to pick exemptions from that list for their property. Choosing which state's exemptions apply in a debtor's case is no less legal advice than choosing a specific exemption.[36] The process of determining which exemption scheme a debtor may use involves a consideration of the debtor's residency history and whether the debtor's state of residence has opted out of the federal exemption scheme. This is an exercise of legal judgment. By determining that Utah's exemptions applied in the Talbots' and Ms. Monson's cases, Mr. Odekirk provided legal advice regardless of whether he chose the specific exemptions for their property.

The evidence further established that Mr. Odekirk did choose specific exemptions in both cases. Ms. Monson's testimony—which was credible and unrefuted—was that Mr. Odekirk had given her a Schedule C with the column for the exemption statute left blank except for a typed "7" at the beginning of each line.[37] Ms. Monson could not write in the remainder of the exemptions due to her poor penmanship, so the numbers were filled in for her and Mr. Odekirk had her initial each entry. This testimony is borne out by Ms. Monson's Schedule C, which shows an "AM" after each

---

provision that exempts them under Utah law along the right-hand side. A few of the provisions are not correct matches for the listed items of property, while others misstate the law. For example, the Schedule C Utah Exemption lists "Wages" as property exempt under Utah Code Ann. § 70C-7-103, but that provision does not create an exemption in bankruptcy. *Gladwell v. Reinhart (In re Reinhart)*, 291 P.3d 228, 231 (Utah 2012). Although the Talbots and Ms. Monson filed their cases before the Utah Supreme Court decided *Reinhart*, there was no indication that the Schedule C Utah Exemption was amended to reflect that decision.

[36] *See Sanchez*, 446 B.R. at 538 ("[M]aking the decision on behalf of the debtor to elect federal or state exemption statutes, constitutes impermissible legal advice under 11 U.S.C. § 110(e)(2).").

[37] This typed "7," which also appears on the Talbots' Schedule C, is further proof, when viewed in conjunction with the Schedule C Utah Exemption, that Mr. Odekirk determined that Utah's exemptions applied and chose that exemption scheme for the Talbots and Ms. Monson. An exemption claimed under the Utah Exemptions Act, which is codified at Utah Code Ann. § 78B-5-501 *et seq.*, will naturally begin with the number "7."

17

exemption entry.[38] In addition, Mr. Odekirk admitted to advising the Talbots to claim an exemption in a rental deposit under Utah Code Ann. § 70C-7-103 because it was paid out of their wages.

The evidence also established that Mr. Odekirk violated § 110(e)(2) in both cases when he advised the Talbots and Ms. Monson to take the credit counseling course. This plainly constitutes legal advice on bankruptcy procedures and rights under § 110(e)(2)(B)(vii).

The United States Trustee has alleged a violation of § 110(e)(2) in both cases based on Mr. Odekirk's advising the Talbots and Ms. Monson on the ability to pay the filing fee in installments or obtain a waiver of the filing fee altogether. Counseling debtors on whether to set up an installment plan or waive the filing fee concerns bankruptcy procedures and rights and constitutes legal advice under § 110(e)(2)(B)(vii). Mr. Odekirk admitted that he informs clients that he can set up installment payments for the filing fee. The Talbots' testimony established that Mr. Odekirk gave such advice to them, and they filed an application to pay the filing fee in installments prepared by Mr. Odekirk. In Ms. Monson's case, however, there was no testimony presented that Mr. Odekirk advised her about waiving the filing fee or paying it in installments. Ms. Monson did file an application to waive the filing fee, however, which Mr. Odekirk prepared.[39] Given Mr. Odekirk's admission that he gives advice about filing fees and the evidence that he prepared the fee waiver in Ms. Monson's case, the Court concludes that Mr. Odekirk violated § 110(e)(2) in each of the cases by advising Ms. Monson and the Talbots about waiving the filing fee and paying it in installments, respectively.

---

[38] If Mr. Odekirk had written the applicable exemption statute on Schedule C after Ms. Monson had chosen the exemption *without any assistance or advice from Mr. Odekirk, including being given a list of exemptions*, then Mr. Odekirk would be performing the task of a scrivener and would not violate § 110(e)(2). Those are not the facts of this case, however.

[39] Ex. 13.

18

The United States Trustee has alleged that Mr. Odekirk advised the Talbots and Ms. Monson on the scope and effect of a discharge. No evidence, however, was presented that Mr. Odekirk gave such advice. Accordingly, there are no violations of § 110(e)(2) based on this allegation.

The United States Trustee has also alleged that Mr. Odekirk violated § 110(e)(2) by advising the Talbots and Ms. Monson on how to characterize the nature of their debts. The evidence supports such allegations. Page 6 of Mr. Odekirk's intake form contains a subheading entitled "Priority Debts." Beneath that subheading, a client is asked five yes or no questions, including "Do you owe any taxes or other debts to a government unit?" If a client answers "yes" to any of those questions, the intake form provides a space to give information about the debt. The Talbots filled out that intake form, and their Schedule E lists two priority tax debts owed to the Utah State Tax Commission. Mr. Odekirk solicited financial information from the Talbots using the intake form and interpreted the information they had provided in creating their schedules. This constitutes legal advice.[40]

Ms. Monson also completed the intake form, and she testified that she brought a list of her creditors to Mr. Odekirk and obtained a credit report tallying her creditors. Yet Ms. Monson's schedules divide her debts into secured and nonpriority unsecured claims. The Court concludes that Mr. Odekirk interpreted the intake form, list of creditors, and credit report to create Ms. Monson's schedules, assigning the creditors into the categories provided by the schedules. In doing so, he violated § 110(e)(2).

Importantly, it is not merely the act of interpreting the information on the intake form and transferring it to the bankruptcy schedules that constitutes legal advice. Requesting that a debtor

---

[40] Many courts have held that using a questionnaire to gather a debtor's financial information, which is then transferred to the bankruptcy schedules, violates the prohibition against legal advice under § 110(e)(2). *See Briones-Coroy*, 481 B.R. at 737 (collecting cases).

19

complete a questionnaire of the kind used by Mr. Odekirk also contravenes § 110(e)(2). As Judge

Pappas explained in the case of *In re Doser*:

> The U.S. Trustee points out that [the bankruptcy petition preparer] does not have her customers simply fill out blank copies of the bankruptcy schedules to return for processing, and instead uses a form of questionnaire . . . . Attempts through a questionnaire to "simplify" the questions posed and information required in the official bankruptcy forms usually leads to the exercise of judgment by the [bankruptcy petition preparer] in how best to accomplish that result, which in turn inevitably crosses the line by giving potential debtors guidance and advice on how to fill out the forms. To the extent the questionnaire deviates in any way from the official forms, it likely constitutes unauthorized legal advice.[41]

Mr. Odekirk's intake form differs in many respects from the schedules, Statement of Financial

Affairs, and other bankruptcy documents. For example, the intake form asks clients to list the yard

sale value of their personal property, but the schedules ask for the current value of the debtor's

interest in the property without any such qualifier. In addition, the intake form asks clients to list

their adjusted gross income for the past two years, but Question 1 of the Statement of Financial

Affairs asks for the debtor's "gross amount of income." The Court concludes that Mr. Odekirk's use

of the intake form itself constitutes legal advice under § 110(e)(2).

Moreover, the rationale that holds that the use of questionnaires violates the prohibition

against legal advice "applies with equal force to the use of other sources, such as *credit reports* or

'discussions' with the client, to glean information used to prepare the debtor's petition."[42] Mr.

---

[41] *In re Doser*, 281 B.R. 292, 309 (Bankr. D. Idaho 2002); *see also Rosario*, 493 B.R. at 335 ("[B]ecause the completion of bankruptcy forms entails a number of legal decisions, courts have held that a bankruptcy petition preparer's completion of the forms using summarized or recharacterized data obtained from the debtor through written questionnaires or worksheets also constitutes the giving of legal advice and the unauthorized practice of law.").

[42] *Rosario*, 493 B.R. at 336 (emphasis added).

Odekirk's intake form explicitly informs his clients that they need to obtain a current credit report. In addition, he had discussions with the Talbots and Ms. Monson about their assets. In using these sources to complete the Talbots' and Ms. Monson's schedules and other documents, Mr. Odekirk ran afoul of § 110(e)(2).

Mr. Odekirk also violated § 110(e)(2) when he advised the Talbots and Ms. Monson on the valuation of their property. In the Talbots' case, Mr. Odekirk used Kelley Blue Book to value their two vehicles. In Ms. Monson's case, the evidence was inconclusive on whether he used Kelley Blue Book to value her 2007 Honda Pilot, but the evidence was clear that he alone placed a value of $2,000 on it. In addition, Mr. Odekirk requested, through his intake form, the yard sale value for various items of personal property.[43] Valuing a client's property constitutes the type of legal advice proscribed by § 110(e)(2)(B)(vi).[44] Simply put, a bankruptcy petition preparer "may not assist a debtor in determining what information should be included on [bankruptcy] documents."[45]

The final allegation common to both cases is that Mr. Odekirk violated § 110(e)(2) when he completed the Means-Test Calculation in both cases.[46] The box found on the first page of Official

---

[43] Counseling clients to use a yard sale value for their property has been found to constitute a violation of § 110. *See Hannigan v. Marshall (In re Bonarrigo)*, 282 B.R. 101, 106 (D. Mass. 2002).

[44] *See Rosario*, 493 B.R. at 334–35.

[45] *Gomez*, 259 B.R. at 386.

[46] The Means-Test Calculation is a "screening mechanism to determine whether a Chapter 7 proceeding is appropriate." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, ----, 131 S. Ct. 716, 722 n.1 (2011). "If the debtor's Chapter 7 petition discloses that his disposable income as calculated by the means test exceeds a certain threshold, the petition is presumptively abusive. If the debtor cannot rebut the presumption, the court may dismiss the case or, with the debtor's consent, convert it into a Chapter 13 proceeding." *Id.* (citations omitted).

Form 22A entitled "The presumption does not does arise" was checked on Ms. Monson's means test, yet she did not know what that box meant. That box was also checked in the Talbots' case, but neither Mrs. nor Mr. Talbot knew what that box meant. The Court concludes that Mr. Odekirk completed the means test and checked the box in both cases. Completing the means test and determining whether the presumption arises, does not arise, or is temporarily inapplicable constitutes legal advice because it involves legal determinations concerning bankruptcy procedures and rights.[47] Therefore, the Court concludes that Mr. Odekirk violated § 110(e)(2) in each case when he determined that the presumption did not arise.

### B. Allegations Specific to Ms. Monson's Case

The lone allegation specific to Ms. Monson's case is that Mr. Odekirk violated § 110(e)(2) by advising her that she would not lose her rental property or car if she filed for bankruptcy. Ms. Monson's unrefuted testimony shows that Mr. Odekirk gave her such advice, which is a specifically enumerated category of legal advice under § 110(e)(2)(B)(iii). Accordingly, Mr. Odekirk violated § 110(e)(2).

### C. Allegations Specific to the Talbots' Case

The sole allegation specific to the Talbots' case is that Mr. Odekirk violated § 110(e)(2) by advising them that they could spend their tax refund without having to turn it over to the trustee as long as they spent it on necessities and kept their receipts. The Court concludes that Mr. Odekirk offered this advice, which establishes another violation of § 110(e)(2).

---

[47] *See U.S. Trustee v. Brown (In re Martin)*, 424 B.R. 496, 508 (Bankr. D.N.M. 2010) (determining whether the presumption of abuse arises violates § 110(e)(2)); *see also Rosario*, 493 B.R. at 334 (completion of the means test requires "complex legal determinations").

### D. Imposition of Fines

Under § 110(*l*)(1), a bankruptcy court may fine a bankruptcy petition preparer who violates § 110(b) through (h) up to a maximum of $500 per violation. A court has discretion to award less than the maximum fine.[48] The factors courts have examined to determine the appropriate amount of a fine include the nature of the violations and whether the bankruptcy petition preparer had previously been before the court to answer for violations of § 110.[49]

The Court determines that Mr. Odekirk committed 24 separate violations between Ms. Monson's and the Talbots' cases. The eight violations of § 110(b)(1) and (c)(1) deserve a lesser penalty than the $500 maximum. Mr. Odekirk dutifully disclosed his identity in compliance with those provisions on the other documents he prepared for filing in these cases, and he is now aware that he must comply with § 110(b)(1) and (c)(1) with regard to each document prepared for filing whether it has designated lines for the required information or not. Therefore, the Court elects to impose a fine of $10 per violation of § 110(b)(1) and (c)(1) for a total of $80 in fines.

The violations of § 110(e)(2) are more substantial and pervasive. Mr. Odekirk provided legal advice to Ms. Monson and the Talbots on numerous issues, and in each case the legal advice had disastrous consequences. He advised Ms. Monson to file a Chapter 7 case when she had an income-producing property with substantial equity that she was using to support her family. She has now lost that source of support. He advised the Talbots to spend their tax refund, erroneously believing that purchasing necessities and keeping receipts would insulate them from the trustee's reach. As a result,

---

[48] *Sanchez*, 446 B.R. at 540; *see also In re Hernandez*, No. 10-41290 SBB, 2011 WL 5239238, at *12 (Bankr. D. Colo. Oct. 31, 2011).

[49] *See Sanchez*, 446 B.R. at 540.

the Talbots filed a Chapter 13 case to repay a debt that could have been avoided but for the advice Mr. Odekirk gave them.

Furthermore, the manner in which these violations occurred evince an insouciant attitude to the prohibition against giving legal advice. Not only did Mr. Odekirk give legal advice, he knew he was giving legal advice. He plainly told his clients that he could not offer them legal advice yet did so anyway, on certain occasions using his fingers to place quotation marks in the air around the words "legal advice" as he said them, as if that would transform the words that followed into something that would not constitute legal advice. Such an action is the equivalent of the deceitful schoolyard trick of crossing one's fingers behind one's back while professing to tell the truth.

Mr. Odekirk's practices in this regard are not unique. In *Briones-Coroy*, the bankruptcy petition preparer told his clients "that he is not an attorney and that he can't give legal advice" and, like Mr. Odekirk, he had his clients "sign a form to this effect."[50] The court concluded, however, that such statements "do not negate the fact that [the bankruptcy petition preparer was] actually providing, directly and indirectly, legal advice to his customers."[51] This Court makes the same conclusion. No multitude of disclaimers, no legion of notices in contracts can shield a bankruptcy petition preparer from liability under § 110 if that person is in fact providing legal advice.

Mr. Odekirk implicitly argued that he is permitted to offer the services he provides, relying on a letter of understanding sent to him by the Unauthorized Practice of Law Committee of the Utah State Bar ("Committee") on July 29, 2013, which he signed three days later.[52] The letter reveals that

---

[50] *Briones-Coroy*, 481 B.R. at 723.

[51] *Id*.

[52] This letter was received as Exhibit A.

the Committee investigated Mr. Odekirk to determine if he had engaged in the unauthorized practice of law. Mr. Odekirk drew the Court's attention to the following sentence in the letter: "A non-lawyer may also provide 'general legal information, opinions or recommendations about the possible legal rights, remedies, defenses, procedures, options or strategies, but not specific advice related to another person's facts or circumstances.'" The letter also cautioned Mr. Odekirk, however, that "[s]trict compliance with the limits of Section 110 is required of a bankruptcy [petition] preparer."

The Court has already determined that Mr. Odekirk violated § 110(e)(2)'s prohibition against giving legal advice; the Court does not need to examine whether Mr. Odekirk engaged in the unauthorized practice of law as defined in Utah.[53] But even if the Court did examine that question, the conclusions the Court has reached show that Mr. Odekirk applied the law to the specific facts and circumstances of these cases as the Committee's letter expressly forbade him to do.

These cases demonstrate the harm that can result when a person without legal training offers legal advice. The Court elects to impose the maximum fine of $500 for each of the 16 violations of § 110(e)(2) for $8,000 in fines. In total, Mr. Odekirk must pay $8,080 in fines for his violations of § 110. The fines must be paid to the Office of the United States Trustee.

### E. Damages and Forfeiture of Fees

In addition to fines, a bankruptcy petition preparer who violates § 110 or "commits any act that the court finds to be fraudulent, unfair, or deceptive" is required to compensate the debtor.[54] The amount of the compensation includes the debtor's actual damages plus the greater of $2,000 or

---

[53] *See Wynns v. Adams*, 426 B.R. 457, 462–63 (E.D.N.Y. 2010) (distinguishing between legal advice and the practice of law).

[54] § 110(i)(1).

"twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services."[55]

Offering legal advice to debtors can constitute a fraudulent, unfair or deceptive act within the context of § 110(i)(1).[56] Because the Court has concluded that Mr. Odekirk violated § 110 and specifically that he gave legal advice to the Talbots and Ms. Monson, damages are appropriate under § 110(i)(1). Ms. Monson's actual damages result from the attorney's fees she incurred in attempting to correct the errors that Mr. Odekirk's legal advice caused. Those fees amounted to $4,681. In addition, the Court will award $2,000 in statutory damages to Ms. Monson under § 110(i)(1)(B) since it is greater than double the $299 fee she paid to Mr. Odekirk. Therefore, the total damages owing to Ms. Monson are $6,681.

The same reasoning applies in the Talbots' case. The Talbots also incurred $4,681 in legal fees as a result of Mr. Odekirk's erroneous legal advice concerning their tax refund. Therefore, actual damages of $4,681 will be awarded to them. The Court will also award the Talbots $2,000 in statutory damages under § 110(i)(1)(B), for total damages of $6,681.

The Court has discretion to require a bankruptcy petition preparer to forfeit his fee if he violates § 110(b) through (h).[57] Mr. Odekirk has violated three of those subsections, and the Court concludes that forfeiture of the $299 in fees he charged to Ms. Monson and the Talbots is warranted on the facts of these cases.

---

[55] *Id.*

[56] *In re Rojero*, 399 B.R. 913, 919 (Bankr. D.N.M. 2008) (collecting cases).

[57] § 110(h)(3)(B).

*F. Injunctive Relief*

The United States Trustee did not seek to enjoin Mr. Odekirk from acting as a bankruptcy petition preparer pursuant to § 110(j)(1), and this Court will not issue such an injunction *sua sponte*.[58] To provide oversight of Mr. Odekirk's business, however, the Court will order Mr. Odekirk to submit a disclosure every six months to the United States Trustee.[59] The disclosure must list each bankruptcy case in which Mr. Odekirk has prepared for compensation a document for filing during that six-month period, and Mr. Odekirk must sign the disclosure, declaring under penalty of perjury that he has complied with § 110 in each case listed on the disclosure. The first six-month period shall run from December 1, 2014 to May 31, 2015. Mr. Odekirk shall have until the end of the month following the six-month period to submit the disclosure to the United States Trustee.[60] This disclosure requirement shall run for successive six-month periods until further order of the Court.

The Court is authorized as part of its contempt power to enjoin a bankruptcy petition preparer who fails to comply with an order issued under § 110.[61] Therefore, if Mr. Odekirk fails to comply

---

[58] *See In re Sattiewhite*, No. BK-S-08-20843-BAM, 2009 WL 971597, at *3 (Bankr. D. Nev. Apr. 7, 2009) ("Injunctive relief is an extraordinary remedy and implicates a bankruptcy petition preparer's opportunity to operate a business, therefore, all the requirements of notice and due process are required before an injunction may be issued.").

[59] *See* § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). In using its § 105(a) powers to order Mr. Odekirk to submit biannual disclosures to the United States Trustee, the Court is not "contraven[ing] specific statutory provisions" of the Code. *See Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014).

[60] For six-month periods running from December 1 to May 31, the deadline to submit the disclosure will be June 30. For six-month periods running from June 1 to November 30, the deadline will be December 31.

[61] § 110(j)(3).

with any part of the Order and Judgment issued in accordance with this Memorandum Decision, the appropriate party may seek injunctive relief pursuant to § 110(j)(3), and the Court will consider it at that time.

## IV.    CONCLUSION

On the surface, bankruptcy petition preparers face an apparent dilemma. They can abide by the commands of the statute and refuse to answer the legal questions of beseeching clients, or they can answer those questions and offer advice at the cost of violating § 110. Yet the notion that bankruptcy petition preparers should even contemplate choosing between those two alternatives reveals a fundamental misunderstanding—by bankruptcy petition preparers and their clients alike—of what bankruptcy petition preparers can do. The statute is clear: bankruptcy petition preparers cannot offer any legal advice. They "cannot do anything other than typing, data input, or photocopying, *period*."[62] When this restriction is understood, it should be plain that a bankruptcy petition preparer's job does not include offering advice, whether solicited or not, on bankruptcy law and procedures.

Mr. Odekirk has gone well beyond the bounds of the statute by providing legal advice to the Talbots and Ms. Monson. That alone is enough to violate § 110, but in these cases the legal advice Mr. Odekirk gave was grievously wrong. Ms. Monson has lost the very asset she wanted to keep, and the Talbots are repaying a debt that never should have existed.

In addition, Mr. Odekirk's insistence that his clients do not need an attorney woefully underestimates the complexities of bankruptcy law and offers those clients a false sense of security.

---

[62] *Briones-Coroy*, 481 B.R. at 694.

28

While it is true that some bankruptcy cases are successfully navigated without the aid of an attorney, those are the rare exceptions, not the rule. The Court recognizes that debtors will naturally have questions about a foreign and unfamiliar subject like bankruptcy. If debtors do seek out legal services in connection with their bankruptcy cases, those services require "legal training and the assurance of comprehensive, competent representation that only a licensed attorney can provide."[63]

Pursuant to the Court's findings of fact and conclusions of law, the Court requires Mr. Odekirk to pay a fine of $8,080 to the United States Trustee, to pay $6,681 in damages to the Talbots and $6,681 in damages to Ms. Monson, to disgorge his fee of $299 in each of the two cases, and to submit biannual disclosures as outlined in Section F, *supra*. A separate Order and Judgment will be issued in accordance with this Memorandum Decision.

_____END OF DOCUMENT_____

---

[63] *Gomez*, 259 B.R. at 386.

_____ooo0ooo_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Virgle F. Odekirk
285 West Tabernacle #101
St. George, UT 84770
*Bankruptcy Petition Preparer*

Alysse Terry Monson
1083 North 775 West
Cedar City, UT 84721
*Debtor*

Geoffrey Chesnut
RED ROCK LEGAL SERVICES P.L.L.C.
249 East Tabernacle, Suite 102
St. George, UT 84770
*Attorney for Alysse Monson*

Stanley A. Talbot & Presha A. Talbot
P.O. Box 197
Parowan, UT 84761
*Debtors*

John T. Morgan
OFFICE OF THE UNITED STATES TRUSTEE
Ken Garff Building
405 South Main St., Suite 300
Salt Lake City, UT 84111
*Attorney for the United States Trustee*

David C. West
321 North Mall Drive, Suite 0-202
St. George, UT 84790
*Chapter 7 Trustee*

Kevin R. Anderson
Ken Garff Building
405 South Main St., Suite 600
Salt Lake City, UT 84111
*Chapter 13 Trustee*